COOLEY et al. v. STANDARD OIL CO. OF LOUISIANA.

(District Court, E. D. Louisiana. February 17, 1927. On Rehearing, April 14, 1927.)

No. 18065.

Salvage ⬡➾34—River packet worth $35,000 held entitled to $3,000 salvage for services to helpless tug and barges with cargo worth $270,000.

A Mississippi river packet, worth $35,000, which deviated from her regular trip to tow to the bank and make secure a tug with a tow of eight barges laden with oil, which had broken her engine and was helpless, drifting with the current, and without means of anchorage, given a salvage award of $4,000; the tug and tow with cargo being of the value of $270,000, and the service requiring something more than an hour, and attended with some danger to the packet.

In Admiralty. Suit by L. V. Cooley, master and owner of the steamer America, against the Standard Oil Company of Louisiana. Decree for libelant.

John D. Grace (of J. D., M. A. & E. H. Grace), of New Orleans, La., for libelant.

Arthur A. Moreno (of Lemle, Moreno & Lemle), of New Orleans, La., for respondent.

BURNS, District Judge. Libelant, L. V. Cooley, as owner and master of the steamer America, claims salvage by a libel, in personam, of the Standard Oil Company of Louisiana as the owner of the steam tug Standard and eight oil barges. The service rendered consisted in the rescue of the tug and barges, which were adrift in the Mississippi river some 60 miles above New Orleans because of a breakdown in the tug's engine, by towing the helpless tug and tow safely against the west bank of the Mississippi river at a point opposite St. James Church, on the evening of March 31, 1925.

There is the usual dispute as to the value of the services.

The evidence shows that the America is a stern wheel river packet. She was proceeding on a voyage from New Orleans up the river with passengers and freight, bound for Monroe, La., making the usual intervening stops. Her third rudder had been unshipped at New Orleans, and was intended to be put in position en route, at some convenient stop affording a suitable depth of water.

Some 60 miles above New Orleans, just before rounding College Point, at about dusk in the evening, the America sighted the towboat Standard ahead, being attracted by its distress signal of four blasts. The Standard had a tow of eight barges loaded with fuel oil, lashed in square formation.

Responding to the distress signal of the tug, which was drifting downstream toward the west bank, abreast of the St. James Plantation, the libelant, at the request of the master of the Standard, went alongside, ran out two headlines, which were made fast over the port stern barge of the tow, with a breast line to the tug from her starboard. The engines of the America were then put into reverse to check up the tug and tow in their drift toward the next bend in the river, and they were finally flanked into the west bank, where two deadmen were buried ashore to afford anchorage for the heavy flotilla. During this operation the Standard stood by, holding the flotilla in position. The whole operation consumed one hour and fifteen minutes, during which time the river packet was turned from her voyage.

A considerable record was built up in this case in an effort to measure the danger to which the property involved was exposed. Much of this testimony deals with speculative considerations.

On the part of the libelant, it is urged that the cargo of oil in the eight barges was of itself a menace; that five of the barges were wooden and in a dilapidated condition, and that the steel barges were likely to buckle, more especially should the flotilla run ashore, thereby endangering a loss of the cargo, which was valued at some $70,000; that the packet might have been crushed against the bank, and was subject to the danger of loss by fire; that, having turned out of its usual course to perform a towboat service for which it was not designed, the packet would forfeit its own insurance of $40,000, so that libelant risked a total loss.

Of course, it is proper to consider these suggested risks in determining the award, and, in support of its claim for a large award, libelant cites No. 14488 of the docket, entitled J. H. Smith et al. v. 11 Coal Barges, etc., where Judge Foster allowed 25 per cent. of the value, less certain deductions for damage, and cites in Scows 9, 16, and 24, 45 F. 902 (D. C. S. D. N. Y.), where Judge Brown allowed 25 per cent. of the value; The E. M. Bicknell, 1 Bond. 270, Fed. Cas. No. 1476, where 25 per cent. was allowed; The Myrtle Tunnel (D. C.) 146 F. 326, where 50 per cent. was allowed; The Galaxy, 1 Blatchf. & H. 270, Fed. Cas. No. 5186, 25 per cent. allowed.

On the other hand, the respondent strenuously insists that the salvage service was of a very low order, that all of the dangers sug-

gested by libelant belong in the realm of fancy, and that, in fact, the mere towboat operation, considering the value of the packet, was worth no more than $35 per hour, and, payable on salvage principles, on a double towage basis only, or say any more than the sum of $250.

Respondent cites The Jean L. Somerville, 286 F. 35, where only $1,000 was allowed for the salvage of a schooner, the master of which had died with no navigator left aboard except the master's widow; the case of Magnolia Petroleum Co. et al. v. National Oil Transport Co. et al., 286 F. 40, in which Judge Bryan of the Circuit Court of Appeals, Fifth Circuit, made an award of $1,700, where $20,000 had been claimed, notwithstanding the value involved. In that case the Bolikow, a wooden tank barge worth $225,000, had a cargo of oil worth $30,000, which was helplessly drifting in the Gulf 120 miles from Tampico, exposed to the dangers of the open sea, was towed in.

However, the value of the packet America was from $35,000 to $45,000. She was exposed to some danger, particularly since she was not designed for towboat service, and was under a disadvantage by reason of the absence of her third rudder. Her response to the distress signal was prompt, and the service was efficient.

The total value of the tug Standard, the five wooden barges, three steel barges, and the cargo of oil, was approximately $270,000. This property was subject to considerable risk, damage, and possible loss by collision, either with the river banks or with other craft. The tug was entirely helpless, with its tow, and at the mercy of the current, without means of anchorage. This is emphasized by the fact that no suitable anchors or moorings were available, and it was necessary to use deadmen ashore for that purpose.

Under all of the circumstances of this case, I am disposed to think that an award of $3,000 is reasonable and just in the premises.

Accordingly, a decree will be entered, with costs.

## On Rehearing.

Considering the pleadings and the evidence submitted on rehearing, I am of the opinion that the award of $3,000, made originally herein, should be increased to $4,000, one-fourth of which is to be divided among the officers and crew of the packet America in proportion to their respective salaries and wages.

The final decree may be drawn accordingly.