UNITED STATES of America, Appellee,

v.

Jose Pagan CAMPINO and Oscar Estrada Ruiz, Defendants–Appellants.

Nos. 195, 196, Dockets 88–1414, 88–1415.

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1989.

Decided Nov. 22, 1989.

Jerald Levine, Jackson Heights, N.Y., for defendant-appellant Oscar Estrada Ruiz.

Barry E. Schulman, Brooklyn, N.Y. (Michael A. O'Connor, Doreen T. O'Connor, Schulman & Laifer, Brooklyn, N.Y., of counsel), for defendant-appellant Jose Pagan Campino.

Beryl A. Howell, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge,
LUMBARD and PIERCE, Circuit
Judges.

OAKES, Chief Judge:

Jose Pagan Campino and Oscar Estrada Ruiz appeal from final judgments of the United States District Court for the Eastern District of New York following a jury trial before Charles P. Sifton, *Judge*, convicting them of conspiracy to distribute and possess with intent to distribute cocaine, 21 U.S.C. §§ 841(a)(1) and 846 (1982), and of possession of a firearm by an illegal alien, 18 U.S.C. § 922(g)(5) (Supp. V 1987). Appellants were each sentenced to a term of 125 months' imprisonment followed by three years of supervised release on the first count and to a concurrent term of twelve months' imprisonment and three years of supervised release on the second count. Campino was also fined $98,000, and both received the mandatory $100 special assessment.

Campino and Ruiz raise several claims on appeal: (1) the district court erroneously refused to grant a pre-trial hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); (2) the district court abandoned its impartial role and acted as the government's advocate during the pretrial suppression hearing; (3) the district court erroneously admitted testimony by law enforcement officials; and (4) there was insufficient evidence to sustain appellants' convictions because there was no tangible evidence establishing their participation in a cocaine conspiracy. Finding these contentions to be without merit, we affirm.

## BACKGROUND

The investigation that culminated in appellants' convictions began with the arrest of Nelson Taylor–Lopez, a person apparently unknown to appellants, on December 2, 1987 on a charge of conspiracy to distribute cocaine. A search of Taylor–Lopez's apartment at 92–29 Queens Boulevard, Queens, New York, on that date turned up, *inter alia*, a Consolidated Edison bill for an apartment at 121–16 Keel Court in College Point, Queens, and a money order made out to the New York City Parking Violations Bureau that listed the same address. Because Drug Enforcement Administration ("DEA") agents found items at the Queens Boulevard apartment that they believed to be related to the sale of cocaine but did not find any of the drug itself, they focused their investigation on the Keel Court apart-

ment as the possible "stash" for Taylor–Lopez's inventory of cocaine.

An affidavit executed in support of a search warrant application for the Keel Court apartment by DEA agent William Dolinsky stated that a DEA investigation turned up evidence of several more connections between the apartment and Taylor–Lopez. The evidence included information from two neighbors who identified Taylor–Lopez (through a photograph) as living in the apartment and from four neighbors who stated that a "Spanish looking" resident drove a late model red Corvette, the same type of car that Taylor–Lopez drove. Neighbors also reported suspicious activity at the apartment, including many late night visitors and a recently installed surveillance camera in the building's hallway.

Based on this information, DEA agents received and executed a warrant to search the premises on December 7, 1987. The search revealed, however, that appellants—who had just moved in—and not Taylor–Lopez lived in the apartment.[1] Among the items seized were three notebooks, two receipts, two handguns, three beepers, two mobile telephones, a counterfeit money detector and over $93,000 in cash. DEA agents also seized all kinds of electronic surveillance and counter-surveillance equipment, including vibrating warning devices, "bug" detectors and recording equipment.

A two-count indictment was filed against appellants on December 21, 1987. Prior to their trial, the district court denied appellants' request for a *Franks* hearing on the truthfulness of the affidavits supporting the warrant application. The court did hold a suppression hearing and found that the search warrant was executed properly.

The government's case at trial was based largely on testimony regarding the notebooks and electronic equipment found at the premises and the practices of drug traffickers. Detective Michael Connors and Agent Dolinsky testified that drug operations typically use sophisticated electronic equipment like that seized from appellants' apartment. Agents Dolinsky and Richard

McCarthy testified that large drug operators typically keep their stash of drugs and financial operations in separate locations.

Agent McCarthy also offered expert testimony that the seized notebooks contained the records of a cocaine operation, including ledger sheets showing amounts owed by customers for the purchase of kilogram quantities of the drug, chronological ledgers showing cocaine sales between September and November 1987 and various expenses of the operation. Agent McCarthy connected the financial records to cocaine sales based on the similarity between the street value of a kilogram of cocaine at that time, which he estimated to have been $14,000 to $18,000 per kilogram wholesale, and the figures contained in the notebooks. He also testified that a notebook that listed customers' names also listed amounts owed to "Ruben," which was a name used by Campino, and that another notebook listed payments made to "Ruben," "Oscar" and "Nora." A handwriting expert testified that the notebooks, receipts and address books seized were written by Ruiz.

## DISCUSSION

### 1. Denial of *Franks* Hearing

Appellants claim that the trial court erred in denying their request for a *Franks* hearing to challenge the affidavit upon which the search warrant was issued. They argue that the DEA agents who prepared the affidavit deliberately failed to interview the landlord of the Keel Court apartment, which would have caused them to learn that Taylor–Lopez no longer lived there.

■ *Franks* requires that a hearing be held

where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false

---

**1.** Nora Estrada Ruiz, who is Campino's wife and Ruiz's sister, also lived in the apartment and was arrested at the scene. She is presently a fugitive.

statement is necessary to the finding of probable cause. . . . 438 U.S. at 155–56, 98 S.Ct. at 2676–77. Material omissions from an affidavit are governed by the same rules as false statements. *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). *Franks* does not require that all statements in an affidavit be true; it simply requires that the statements be "believed or appropriately accepted by the affiant as true." 438 U.S. at 165, 98 S.Ct. at 2681.

■ The trial court denied the request for a *Franks* hearing because appellants failed to produce evidence of deliberate falsehood or recklessness in the affidavit. We agree and note that the affidavit contained sufficient information to support the agents' belief that Taylor–Lopez used the Keel Court apartment. Supporting evidence included the electric bill and money order that were seized during the search of his apartment, the identification of his photograph by two neighbors and the presence of a late-model red Corvette at Keel Court. Given these corroborating details, the agents had a sufficient basis for their belief and were not obligated to track down and interview the landlord. Even though the agents turned out to be wrong about who lived in the apartment, that fact alone was insufficient to mandate a *Franks* hearing.

### 2. Suppression Hearing

■ Appellants contend that the trial judge abandoned his impartial role and acted as the government's advocate during the suppression hearing, which focused on whether the search was conducted before or after Magistrate Caden issued the warrant at 12:55 P.M. on December 7, 1987. At the hearing, the government and appellants each presented one witness who testified as to the time of the search. The government's witness, Agent Dolinsky, testified that the search occurred sometime after 3 P.M. Appellants' witness, a neighbor who lived across the street on Keel Court, testified that the search began between noon and 1 P.M.

Although appellants argue that the judge then directed the government to call its second witness, Sergeant Robert Plansker of the New York Drug Enforcement Task Force, the transcript does not bear this out.[2] Faced with conflicting testimony and what he considered to be a close issue of credibility, the judge suggested that the government should call another witness. In so doing, the court acted within its province. It is the very function of the trial court to establish the facts as clearly and completely as possible. To fulfill that function effectively, indeed, the court is empowered to call and question witnesses sua sponte. *See* Fed.R.Evid. 614(a)–(b). By seeking additional evidence to resolve a clear conflict, the court in no way displayed a predisposition towards the government's position.

### 3. Admissibility of Testimony

Appellants raise three main issues concerning the testimony of law enforcement officials: (1) Agent Dolinsky and Detective

**2.** The relevant exchange reads:

The Court: So that is it, citizen against government official. I am supposed to go with the government official? That is the argument?

AUSA: No, Your Honor, I think—

The Court: Trained observer against untrained observer; that is it? How many people were there at the time?

AUSA: During the execution?

The Court: What inference do you think I ought to draw from the fact that you don't even put these people on the stand?

AUSA: Your Honor, we can call additional agents.

The Court: You are darned right you can. They still work for the government; don't they? What kind of system do you think this is where a citizen comes in whose business is up in the Bronx, gives his testimony under oath, creates a clear conflict of credibility, and I am supposed to go and believe the government agent, even though there are other people who could come in here and testify under oath and help me revolve [sic] the credibility issue?. . . . You have no one further to call?

AUSA: No, Your Honor, the government will call an additional agent who was at the scene.

Transcript of Mar. 22, 1988 at 54–55.

Connors, who investigated the case, had a conflict of interest when they also gave expert opinion testimony; (2) Agent McCarthy was not qualified as an expert; and (3) Agent McCarthy testified as to conclusions of law beyond the scope of Fed.R.Evid. 704.

We note at the outset that appellants face a heavy burden. Fed.R.Evid. 702 allows a qualified expert to testify in the form of an opinion if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." A decision to allow expert testimony is within the broad discretion of the trial judge and is to be sustained on appeal unless manifestly erroneous. *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Young,* 745 F.2d 733, 760 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). We have repeatedly held that "the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702." *United States v. Diaz,* 878 F.2d 608, 617 (2d Cir.1989)[3] (quoting *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987)).

■ Appellants claim that the trial court should not have permitted Agent Dolinsky and Detective Connors, who investigated appellants' case, to testify about the methods of drug operations. Appellants specifically object to testimony concerning drug dealers' use of electronic surveillance and counter-surveillance equipment like that found at the apartment and their use of stash houses for drug money. However, as we have held previously, it is "not improper for the government to elicit this expert testimony from law enforcement officers who also testified as fact witnesses." *Young,* 745 F.2d at 760. Furthermore, the danger of confusion to the jury between fact and opinion testimony was minimized by the court's admonitions to the witnesses

not to draw conclusions about appellants' conduct.

■ As to the testimony of Agent McCarthy, there is ample evidence to support the district court's ruling that he was qualified to be an expert on narcotics transactions pursuant to Rule 702. A DEA agent for five years, Agent McCarthy had participated in hundreds of DEA narcotics investigations, half of which involved cocaine. He had an advanced degree in economics, had taught accounting and had reviewed records seized from cocaine operations on at least a hundred occasions. Given these facts, we cannot say that the district court ruling was manifestly erroneous. *Cf. Diaz,* 878 F.2d at 616–18 (Agent McCarthy testified as expert).

■ Furthermore, Agent McCarthy's testimony regarding the contents of the three notebooks that were seized and the hierarchy of drug distribution operations did not exceed that which is permissible under Rule 704. Although trial courts must be cautious about the use of expert testimony in criminal prosecutions, *see, e.g., Brown,* 776 F.2d at 401 & n. 6, Agent McCarthy's analysis of the notebooks was the sort of "expert testimony to explain the use of narcotics codes and jargon" that we have found permissible. *See Nersesian,* 824 F.2d at 1308 (citing cases); *see also Diaz,* 878 F.2d at 616–18 (upholding the admission of testimony by Agent McCarthy interpreting seized financial records). The court properly reminded the jury that the testimony reflected only Agent McCarthy's opinion as to the contents of the notebooks and that they were free to reject his testimony entirely if they found it unsupported by the evidence. Unlike *Brown,* Agent McCarthy testified as an expert and not as a member of the investigation team, further reducing the danger of confusion to the jury.

Accordingly, we find the objections to the expert testimony at appellants' trial to be without merit.

---

**3.** We note that *Diaz,* which was decided six days before appellants filed their brief and was not cited in it, is dispositive of most of appellants'

arguments concerning the use of expert testimony and the sufficiency of the evidence.

**594**

### 4. Sufficiency of Evidence

 Lastly, appellants argue that there was insufficient evidence to support the charge that they participated in a cocaine conspiracy because the only evidence linking them to the drug was expert testimony. It has often been repeated that a party challenging the sufficiency of evidence bears a very heavy burden. *E.g., Diaz*, 878 F.2d at 618 (quoting *United States v. Chang An-Lo*, 851 F.2d 547, 553 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988)). The test to be applied is "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." *Diaz*, 878 F.2d at 618 (quoting *Chang An-Lo*, 851 F.2d at 554). The evidence is to be viewed in the light most favorable to the government, and all permissible inferences are to be construed in the government's favor. *Diaz*, 878 F.2d at 618.

This is not the first time we have faced the issue of the sufficiency of evidence of a cocaine conspiracy when no cocaine was found. Although no cocaine was found in *Diaz, supra*, we held that evidence from financial ledgers, suspicious activity and large amounts of cash was sufficient to sustain a cocaine conspiracy conviction. *Id.* at 618–20. Like *Diaz*, the evidence adduced at appellants' trial consisted of notebooks listing sales of kilogram quantities of cocaine; records indicating that appellants received payments for the drugs; and surveillance and counter-surveillance equipment and cash seized from their apartment. Although the records were written by Ruiz, the fact that they listed payments to Campino (using an alias) was sufficient for the jury to tie the latter into a cocaine conspiracy. We thus find that there was sufficient evidence to convict appellants of the cocaine conspiracy.

### CONCLUSION

We have considered all of appellants' contentions and find them to be without merit. Accordingly, the judgments of conviction are affirmed.